24 P.3d 602

In the Matter of William J. WALKER, Attorney No. 5337, Respondent.

No. SB–00–0096–D.
Disc. Comm. No. 99–0406.

Supreme Court of Arizona,
En Banc.

June 19, 2001.

State Bar of Arizona by Yigael M. Cohen, Phoenix, Jennings, Strouss & Salmon, P.L.C. by J. Scott Rhodes, Phoenix, Attorneys for Respondent.

## OPINION

FELDMAN, Justice.

¶ 1 William J. Walker petitions for review of a recommendation from the Disciplinary Commission (Commission) that he be suspended from the practice of law for ninety days. Upon review, we find the Commission's sanction too severe and instead adopt the hearing officer's recommendation that Walker be censured. We have jurisdiction under Rule 53.e, Rules of the Supreme Court of Arizona (Rule), and Arizona Constitution, Article 6, Section 5.6.

## FACTS AND PROCEDURAL HISTORY

¶ 2 Walker is a fifty-one-year-old sole practitioner who focuses primarily on personal injury law. He has been married for almost twenty-five years, has two teenage children, has practiced law for over twenty years, and has never before been disciplined by the State Bar.

¶ 3 On January 17, 1999, a thirty-two-year-old woman named Sherry Muldrew appeared at Walker's office. She had been involved in an automobile accident about two weeks earlier. Because Muldrew's insurer offered insufficient funds to repair her car, she was seeking legal assistance. At the time, Muldrew was separated from her husband, caring for her three young children, and seeking permanent employment. At her first meeting with Walker, Muldrew signed a contin-

gent fee agreement, and Walker helped arrange both her medical care and car repair. Over the next month, Muldrew met with Walker several times, most of the visits brief and unscheduled. In early February, she signed another contingency agreement with him that was connected with her claim against a local restaurant over an alleged food poisoning incident.

¶ 4 Later in February, Muldrew received a check from her insurer to compensate for her vehicle's damage. Instead of applying the funds toward the repair bill, she used it to travel because she was anticipating a large income tax refund that would cover her car repair costs. Later, Muldrew told Walker that she needed her vehicle badly but could not afford to pay the repair shop immediately, and Walker arranged to have Muldrew's car released to her without payment. Muldrew soon learned that the Internal Revenue Service was using her income tax refund to offset accumulated federal debts. She called Walker's office and asked for an emergency appointment because she did not have any money, her rent was due, she did not have a steady job, and she was rapidly accumulating debt.

¶ 5 On Thursday, February 18, Muldrew met with Walker in his office to discuss how any potential settlement funds would be disbursed. In addition, the two talked about the possibility of a sexual relationship and arranged to meet at Walker's office on Saturday morning because the members of Walker's staff would not be there at that time. Before Muldrew left, Walker touched her breast. . The next day, Muldrew met with another attorney regarding a malpractice claim she planned to bring against Walker. On Saturday morning, February 20, Walker contacted Muldrew to arrange the office interlude. After agreeing to meet, Muldrew contacted a Tempe police officer and instead went to a police substation to make tape-recorded telephone calls to Walker.

¶ 6 During the first call, Muldrew spoke only to the answering service. Muldrew reached Walker with a second call, however, and stated, "Hey, ya know, before I come .. I wanna make sure that we have an understanding, OK?" *Hearing Officer's Report and Recommendation* (*H.O.Rep.*), filed April 18, 2000, Exhibit A, at 2–3. As the two attempted to outline the parameters of their sexual relationship, Walker said, "I don't want this to be part of our business thing, you know" and "I don't, you know, this is somethin' that I want you to do. I don't want it to be a...." *Id.* at 3 (ellipsis in original). To which Muldrew responded, "OK, well, my kids, uh, I gotta make sure I get, you know, leave and get back before my kids wake up." *Id.* About an hour after the second call, Muldrew again telephoned Walker from the police station and told him, "I'm gonna come get my records, because what happened the other day? It wasn't right. It wasn't right." *Id.* at 4. The following dialogue then took place:

Walker: All right, well, let's .. You don't need to get your records. Let's just forget it, then we'll just do it as business.

Muldrew: I know, but you said about bein' special friends.

Walker: No, let's forget. I don't wanna .. It's, it's all right. I don't want .. Let's just forget that at all. You were the one that started with (both talking)..

Muldrew: No! No!

Walker:.. If you weren't there .. I..

Muldrew: That's not true.

Walker: All right, look ..

Muldrew: What I .. No! .. What I, I told you [was] that you were really nice. I said that you were a really nice man, and you ..

Walker: And I apologize for anything else.

*Id.* at 4. The conversation continued, ending with similar exchanges: Muldrew accusing Walker of exploiting her precarious situation and Walker attempting to keep Muldrew as a client while repeatedly apologizing for any offense or misunderstanding. After the third call, the two did not have either personal or professional contact until the following Monday when Muldrew went to Walker's office, retrieved her files, and terminated Walker's representation.

¶ 7 Based on Muldrew's allegations and the evidence gathered during the tape-recorded telephone calls, Tempe police officers went to

Walker's office on March 1, 1999, and arrested him for public sexual indecency and solicitation of prostitution. Walker was handcuffed, led from his office by the police, and booked at the jail. To avoid prosecution on these charges, Walker entered an adult diversion program, which he subsequently successfully completed. In addition, Walker sought both psychological and spiritual counseling. Muldrew's new attorney sent a letter demanding $400,000 to Walker's malpractice insurer regarding Muldrew's allegations of impropriety. Walker's insurer and Muldrew thereafter agreed on a $50,000 settlement, $2,500 of which was a deductible Walker paid personally.

¶ 8 On April 7, 1999, Muldrew filed a complaint with the State Bar. After an investigation, the State Bar filed a one-count complaint alleging Walker violated Ethical Rules (ER) 1.7 and 8.4, Rules of Professional Conduct, for failure to avoid a conflict of interest and misconduct. *See* Ariz.R.Sup.Ct. 42. Walker filed an answer denying many of the allegations but admitted to briefly touching Muldrew's breast under what he believed were consensual circumstances.

¶ 9 A disciplinary hearing was held in March 2000, and in his report the hearing officer recommended censure. *H.O. Rep.*, at ¶ 54. On April 20, 2000, the Commission served a copy of the hearing officer's report on both Walker and the State Bar and notified each that, pursuant to Rules 53.c.7 and d.3, objections to the report and requests for oral argument before the Commission should be made within ten days. On May 9, the Commission notified Walker that it would consider the matter during an executive session on May 20. In addition, the Commission advised Walker that, pursuant to Rule 53.d.1, either party could request leave to file a statement. The Commission did not request further briefing on the matter and, because neither he nor the State Bar objected to the penalty of censure, Walker did not submit a statement.

¶ 10 On May 22, the Commission notified Walker that it had considered and rejected the hearing officer's censure recommendation. Instead, the Commission told Walker that it was recommending a ninety-day sus-

pension. Walker promptly filed a motion for leave to file pleadings, and the Commission granted it. He then filed both a motion for reconsideration and a request to appear before the Commission. The Commission summarily denied Walker's motion and request to appear and filed its report in this matter on August 30, 2000. Walker petitioned for review of the Commission's recommendation of suspension pursuant to Rule 53.e.

## DISCUSSION

¶ 11 Walker claims on appeal that he was denied procedural due process when the Commission rejected the hearing officer's uncontested recommendation without first notifying him of the change, requesting his appearance, or asking for supplemental briefing. In addition, Walker asserts that, given the facts of this case, the Commission erred when it recommended a ninety-day suspension. We address these issues in turn.

### A. Due process

¶ 12 Walker acknowledges that, by failing to object to the hearing officer's recommendation, he consented to censure. *See* Ariz.R.Sup.Ct. 53.c.9 ("Failure of a party to appeal within the time provided shall constitute consent to the discipline recommended by the hearing officer"). He argues, however, his consent was not an agreement to the increased sanction of suspension. Thus, because the Commission never provided him with notice that it would raise the sanction without giving him an opportunity to appear or respond, the Commission improperly "upped the ante" and denied him due process. While the Commission's actions in this case may have come as an understandable surprise to Walker, we do not find that his due process rights were violated.

¶ 13 The requirements of procedural due process in attorney disciplinary proceedings include fair notice of the charges made and an opportunity for the accused to provide an explanation and present a defense. *In re Brady*, 186 Ariz. 370, 373, 923 P.2d 836, 839 (1996). Here, Walker was provided both notice and a hearing. He was given proper

notice regarding the Commission's consideration of his matter and also was extended the opportunity to request oral argument or file supplemental statements before the Commission. *Notice,* filed May 9, 2000; *see also* Ariz.R.Sup.Ct. 53.d.3. In addition, Walker was able to present all of his evidence during the preceding disciplinary hearing before the hearing officer. Indeed, this was both the appropriate and the only time that evidence regarding the charges and his defense could be presented. Ariz.R.Sup.Ct. 53.d.3 ("Evidence not presented to the hearing officer shall not be presented to the commission"). The Commission's function is to review the record made before the hearing officer and "prepare and file a written report, affirming, reversing or modifying the findings of fact, conclusions of law or recommendation(s)" of the hearing officer. *Id.* at subsection d.4. Thus, the rules governing disciplinary procedures allow the Commission to do what it did here—that is, reject a hearing officer's recommendation and instead recommend a different, more severe sanction.

¶ 14 Arguably there is nothing in the rules that would put a party on express notice that, where no objection has been made, the Commission may cast aside a hearing officer's recommendation and impose a harsher sanction. However, in every case in which a hearing officer recommends a penalty greater than a reprimand, the matter automatically proceeds before the Commission for review. Ariz.R.Sup.Ct. 53.d. Because the Commission's standard of review over questions of law is *de novo,* once Walker's matter reached the Commission, it was free to approve the hearing officer's recommendation of censure or recommend any other sanction it deemed appropriate. *Id.* at subsection d.2. Given the circumstances here, we understand Walker's surprise that such a determination was made but do not believe that the Commission's upping the ante was improper.

¶ 15 In *In re Piatt,* we reasoned that a party appealing to this court does not "expect[ ] that by appealing, things will get worse" and it was therefore inappropriate for us to reject the Commission's recommendation of censure and suspend the respondent lawyer, even though several members believed that a censure "might be too lenient" and "[o]thers would have ordered suspension had they been making the decision in the first instance." 191 Ariz. 24, 27, 951 P.2d 889, 892 (1997). However, *Piatt* did not find that upping the ante, whether done by this court or the Commission, violates due process. Indeed, a majority in *Piatt* recognized that this court's "ultimate authority in disciplinary matters makes upping the ante possible." 191 Ariz. at 27, 951 P.2d at 892; *see also id.* at 29, 951 P.2d at 894 (Feldman, J. and Jones, V.C.J., concurring in part and dissenting in part).

¶ 16 In this case Walker received what due process requires—notice and a fair opportunity to present evidence to the hearing officer, together with notice and an opportunity to appear before the Commission. He was also on notice that the Commission could reject the hearing officer's recommendation and instead recommend a more severe sanction.[1] He did not avail himself of the right to appear personally before the Commission, nor did he choose to submit any filings. We find no violation of Walker's due process rights.

¶ 17 But the minimum due process required as a matter of law is one thing and that which is appropriate in light of good judgment and fairness is another. When neither the State Bar nor the respondent lawyer objects to a hearing officer's recommendation, and the Commission's preliminary review indicates a possibility that the hearing officer's recommendation may be rejected in favor of more severe sanctions, the Commission is certainly free to so inform the Bar and respondent (in effect notifying the

---

1. It bears noting that the Commission's recommendation is different from a hearing officer's recommendation because the Commission's recommendation becomes a final disposition of the matter unless either the respondent lawyer or the State Bar files a petition for review or we order review *sua sponte.* Ariz.R.Sup.Ct. 53.e.1 & e.7.

In contrast, a hearing officer's recommendation as to suspension and disbarment can never be final, even if neither party objects, as these sanctions can only be imposed by the Commission or this court. *See id.* at subsection c. 8; *see also* Ariz.R.Sup.Ct. 52.a.

parties that they should appear or otherwise make their arguments known) or to follow any other procedure it deems appropriate.

## B. The appropriate sanction

¶ 18 After the hearing officer conducted an extensive hearing, he issued a detailed, twenty-page report in which he noted, "This is a very close case. Its disposition turns on issues of credibility and the burden of proof" and "[t]he critical factual question was whether [Walker] extorted Ms. Muldrew into permitting the touchings and agreeing to a Saturday rendezvous." *H.O. Rep.*, at ¶¶ 2, 22. After thoroughly discussing all of the evidence submitted by both parties, the hearing officer made only two findings of fact:

> Based on the evidence and exhibits adduced at the hearing, considering credibility, the State Bar did not prove by clear and convincing evidence that [Walker] extorted Ms. Muldrew. Thus, the portion of Count 1 based on violation of Supreme Court Rule 42, ER 8.4(b) is dismissed. The portion of Count 1 based on ER 1.7 was admitted by [Walker] and therefore is deemed admitted. This violation arose out of negligence, poor judgment, rather than purpose. It was an aberration.

*Id.* at ¶¶ 42, 43 (citation omitted). The hearing officer then reviewed possible sanctions, examined aggravating and mitigating circumstances, and performed a proportionality review before ultimately recommending censure.

¶ 19 The Commission adopted the hearing officer's findings of fact and, because questions of credibility were involved, gave "great deference" and "great weight and consideration" to those factual findings and recommendation. *Disciplinary Commission Report (Comm.Rep.)*, filed August 30, 2000, at 2; *see also* Ariz.R.Sup.Ct. 53.d.2 (Commission applies clearly erroneous standard to hearing officer's findings of fact). The Commission concluded that Walker's admitted misconduct and the transcripts of telephone conversations between Walker and Muldrew "support the finding that [Walker] committed misconduct by failing to avoid a conflict of interest with his client." *Comm. Rep.* at 2. After considering the range of sanctions al-

lowed and the mitigation evidence presented, the Commission modified the hearing officer's recommendation to a ninety-day suspension. The Commission believed "[t]he more severe sanction of a suspension will, we hope, make the consequences of lawyers putting their personal or financial interests ahead of their clients' interests clear to the members of the Bar and the public." *Id.* at 3. Walker claims that censure, and not the more severe sanction of suspension, is the appropriate penalty in this case.

¶ 20 When this court has or takes jurisdiction in a disciplinary proceeding, it also reviews findings of fact under a clearly erroneous standard and questions of law *de novo*. Ariz. R.Sup.Ct. 53.e.11. In each and every disciplinary case we review, we examine the facts to determine if the evidence supports the factual findings made by the hearing officer and the Commission, as well as to decide on the appropriate sanction, if any. Although we give "deference and serious consideration" to the recommendations of the hearing officer and the Commission, the responsibility to decide upon the appropriate sanction in a disciplinary proceeding is ultimately ours. *In re Curtis*, 184 Ariz. 256, 261, 908 P.2d 472, 478 (1995).

¶ 21 We begin by considering the American Bar Association's STANDARDS FOR IMPOSING LAWYER SANCTIONS (STANDARDS). The STANDARDS address violations of ER 1.7 by stating that suspension "is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict." STANDARD 4.32, at 30. In contrast, censure "is generally appropriate when a lawyer is negligent in determining whether the representation of a client may be materially affected by the lawyer's own interests." *Id.*, STANDARD 4.33, at 31. The comment to STANDARD 4.33 provides some guidance:

> The courts generally impose [censure] when a lawyer engages in a single instance of misconduct involving a conflict of interest when the lawyer has merely been negligent and there is no overreaching or serious injury to a client.

According to the STANDARDS, we must also consider the offender's mental state, the duty involved, actual or potential injury caused by the conduct, and existence of aggravating and mitigating circumstances. STANDARD 3.0, at 25; *see also In re Curtis*, 184 Ariz. at 264, 908 P.2d at 480.

¶ 22 When discussing Walker's mental state and the duty he violated, the Commission claimed that the "more severe sanction of a suspension will, we hope, make the consequences of lawyers putting their personal or financial interests ahead of their clients' interests clear to the members of the Bar and public." *Comm. Rep.*, at 3. However, based on the hearing officer's findings that Walker's admitted misconduct was an "aberration" and that it was attributable to "poor judgment, rather than purpose," we conclude Walker's actions were not intended to further his personal or financial interests at the expense of his client's interests. *H.O. Rep.*, at ¶ 43. While we agree with the hearing officer that "there is a clear potential that [Walker's] personal desires would at some point conflict with his client," there is nothing in the record to suggest that Walker was attempting to extort sexual favors or that Muldrew's underlying personal-injury and food-poisoning matters would not have been competently prosecuted and adequately resolved. *Id.* at ¶ 45. Significantly, the hearing officer's findings regarding credibility favored Walker's claim that the sexual contact was consensual; there was no finding to the contrary.

¶ 23 We agree with the Commission that Walker's "loyalty to his client and her interests was impaired by his own interest in a sexual relationship with her" as "shown by what he said when she objected to his conduct and requested her file" and his initial reluctance to withdraw. *Comm. Rep.*, at 7. Walker's immediate reaction to Muldrew's confrontational call was improper, but because he returned her file without incident at the first available opportunity, we agree with the hearing officer that Walker made a "timely good faith effort to rectify [the] consequences of [his] misconduct" and that Walker's "remorse was genuine." *H.O. Rep.*, at ¶ 50.

¶ 24 We adopt the conclusions of both the hearing officer and Commission that no aggravating factors exist. As for mitigation, the hearing officer found that more than half of the factors enumerated in STANDARD 9.32 exist in this case: absence of a prior disciplinary record; full and free disclosure and cooperative effort toward the proceedings; imposition of other penalties and sanctions; good character; stellar reputation; remorse; absence of a dishonest or selfish motive; and timely good faith effort to rectify consequences of misconduct. *Id.* at ¶ 50. When reviewing the existence of these factors, the Commission determined the hearing officer's finding as to the last two clearly erroneous and disregarded them. *Comm. Rep.*, at 9–10. Regardless of whether all seven or only five of the mitigating factors exist, in the absence of *any* aggravating evidence, we find that cumulatively they weigh in favor of not imposing the more severe sanction of suspension.

¶ 25 We believe there is another important mitigating factor here: Walker's public and personal humiliation. He was arrested at his office and taken to jail in handcuffs. The charges against him were made public by the local press. He was prosecuted for sexual indecency and prostitution and forced to participate in a diversion program. He was the subject of Muldrew's malpractice allegations and agreed to the $50,000 settlement, including the $2,500 deductible that he paid personally. Walker also sought out both religious and mental health counseling. Thus, we agree with the hearing officer's statement that "[w]hat has happened to [Walker] as a result of his touching should be sufficient deterrence to other attorneys." *H.O. Rep.*, at ¶ 54.

¶ 26 When dispensing discipline, we are guided by the purposes of disciplinary proceedings-which are not intended to punish the offender but to protect the public, deter similar conduct among members, and preserve public confidence in the integrity of the bar. *In re Levine*, 174 Ariz. 146, 170, 847 P.2d 1093, 1117 (1993). In determining the appropriate sanction, we note the serious nature of even a ninety-day suspension. Such a sanction entails the following obli-

gations: the suspended lawyer must give up all work on·his or her cases; must notify clients and return their property and papers; must close his or her office; and cannot accept any new matters. *See* Ariz.R.Sup.Ct. 63.

¶ 27 The hearing officer found that, "[b]ased on the evidence in this case ... there is no reasonable probability that [Walker] will re-offend." *H.O. Rep.*, at ¶ 54. The Commission also noted that its recommendation of suspension was "not made necessary because of any concern that Walker will commit similar misconduct in the future." *Comm. Rep.*, at 10. Had the Commission found "evidence that [Walker] might repeat this conduct, then, in order to adequately protect the public, [its] sanction would need to be considerably more severe." *Id.* at 11. We agree with both the hearing officer and the Commission that the public is not in danger of Walker similarly violating ER 1.7 in the future.

■ ¶ 28 Our primary obligation when imposing disciplinary sanctions is to tailor discipline to the facts of each case. *Levine*, 174 Ariz. at 174, 847 P.2d at 1121. Many of the facts in this case were hotly contested. As the hearing officer noted, "Obviously this is not just a case of misunderstanding.... There is simply no way to reconcile both versions [of the events that transpired between Walker and Muldrew]." *H.O. Rep.*, at ¶ 35. Walker asserts that Muldrew was "coquettish" while in his presence, offered to "meet for a drink or something like that," and repeatedly made comments that he was "the nicest man in the world" and that he could "come over whenever [he] want[ed]." Reporter's Transcript of Proceedings, March 15, 2000, at 212, 213, 218, 219. Walker also argues that Muldrew "came on" to him and solicited a relationship by suggestively saying "if you weren't married and I wasn't married." *Id.* at 213, 257. He testified that he believed his actions towards Muldrew were invited and consensual, but that he later figured out that he had been "set up." *Id.* at 257.

¶ 29 In contrast, Muldrew claims she felt obliged to engage in a sexual relationship with Walker because he implied she would not receive a settlement unless the two became "special friends." *Id.* at 32. She claims Walker took advantage of her by accusing him as follows: "You took the situation that I was in and you exploited it for your own personal gain." *Id.* at 246. The hearing officer, however, found none of these allegations proved by clear and convincing evidence, generally favored Walker on issues of credibility, and did not find·a lack of consent; indeed, the hearing officer made no explicit finding on the issue of consent. Thus, we believe the ultimate issue is not in dispute: Walker admitted to breaching ER 1.7 by touching his client's breast and attempting to enter into a consensual sexual relationship with her.[2] In the context of this case, such behavior is properly addressed by censure.

### CONCLUSION

¶ 30 Based on our review of the mitigating evidence, the recommended sanctions articulated by the STANDARDS, and keeping in mind the purposes of attorney disciplinary proceedings, we conclude that censure, and not suspension, is the appropriate sanction in this case. Walker is hereby publicly censured. In addition, he is assessed costs as prescribed in Rule 52.a.8.

CONCURRING: THOMAS A. ZLAKET, Chief Justice, and RUTH V. McGREGOR, Justice.

MARTONE, Justice, concurring in the judgment.

¶ 31 Before 1996, the Commission reviewed findings of fact *de novo.* Review in this court was by appeal, and our standard of review was also *de novo.* But in 1996, we amended our rules so that the Commission served as an appellate body[1] and this court

---

2. Our holding here is limited to the particular facts and circumstances of this case. Thus, we have yet to determine, and did not today hold,

that every instance of consensual sex between attorney and client is a *per se* violation of ER 1.7.

1. The Commission does have original jurisdiction over consent agreements, Rule 56, Ariz. R.S.Ct.,

served as the court of last resort. Accordingly, Rule 53(d)(2), Ariz. R.S.Ct., now provides that, in reviewing the findings made by a hearing officer, "the commission shall apply a clearly erroneous standard." Review in this court is no longer by appeal but is now by petition for review. Rule 53(e), Ariz. R.S.Ct. And, as does the Commission, we now use a clearly erroneous standard in reviewing findings of fact. Rule 53(e)(11), Ariz. R.S.Ct.

¶ 32 Neither the Commission nor this court argues that the hearing officer's findings were clearly erroneous. And yet both the Commission and this court venture off into *evidentiary* matters. This no doubt is what caused the Commission to believe that a suspension rather than a censure was appropriate. It could have reached that conclusion only if the hearing officer's findings were clearly erroneous. The court, too, focuses not on the facts as found by the hearing officer, but on evidence. It describes a criminal prosecution, an adult diversion program, psychological counseling, and a settlement of a civil action. *Ante,* ¶ 7. The court claims it must determine if the evidence supports the factual findings made by the hearing officer and the Commission. *Ante,* ¶ 20. But the Commission is not supposed to make factual findings and no one argues that the evidence does not support the factual findings made by the hearing officer. Why then describe the evidence that supports facts contrary to those found by the hearing officer?

¶ 33 Similarly, the court recites the factual contentions of the parties, *ante,* ¶¶ 28, 29, as though these matter after the hearing officer made his findings. But the clearly erroneous standard of review determines the facts in this court. The court acknowledges that the hearing officer believed Walker and not his client, *ante,* ¶ 29, yet states that the hearing officer "made no explicit finding on the issue of consent." *Id.* But the consensual nature of the touching is both implicit in and vital to the hearing officer's findings. The court should not be ambiguous about this. Whether the contact was consensual or the result of

a demand is critical to determining the appropriate sanction.

¶ 34 We should resolve this question by referring to the findings of fact made by the hearing officer. He specifically found that Walker did not extort his client. Instead, he said ER 1.7, the conflict of interest provision, was violated "out of negligence, poor judgment, rather than purpose." Hearing Officer's Report and Recommendation, Apr. 18, 2000, ¶ 43.

¶ 35 Neither the State Bar, the Commission, nor the court believes these findings to be clearly erroneous. Accordingly, this is a case of consensual touching, and therefore a case of conflict of interest. For that, censure is the more appropriate sanction. I therefore concur in the judgment. But had the hearing officer found that there was more to this case than consensual touching, then suspension would be the more appropriate sanction. If the court is in doubt about this, as its opinion suggests, then it should remand to the hearing officer for supplemental findings on the issue of consent.

Vice Chief Justice CHARLES E. JONES recused himself and did not participate in the determination of this matter.

---

and disability matters, Rule 59, Ariz. R.S.Ct. But the notes to the 1996 amendments to Rule 53(d) acknowledge the difference and make it quite clear that as to disciplinary matters, the Commis-sion's role is "as an intermediate appellate body which is bound by the record below." Rule 53(d), Ariz. R.S.Ct., Notes to 1996 Amendments [d].